UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| WILLIAM R. PARTIN, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:20-cv-00185-SEB-DML |
| | ) | |
| BAPTIST HEALTHCARE SYSTEM, INC. d/b/a | ) | |
| BAPTIST HEALTH FLOYD, | ) | |
| DANIEL J. EICHENBERGER, M.D., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

After a history of staff complaints culminating in a disagreement between an
emergency room doctor and his staff about appropriate treatment procedures for a
suicidal patient who was refusing the specific forms of treatment, i.e., an IV line and a
rectal temperature test, the hospital administrators concluded the physician should no
longer be permitted to see patients in their emergency room. They requested that the
physician's direct employer, to wit, a group of emergency physicians who had contracted
with the hospital to provide emergency room physician support, remove the physician
from further engagement in their facility. The doctor ultimately resigned, and then sued
the hospital and the hospital's president for whistleblower retaliation under the
Emergency Medical Treatment and Labor Act ("EMTALA"), as well as for a host of state
law contract and tort claims. Defendants moved for summary judgment on all claims,
which we now address.

1

## I.   SUMMARY JUDGMENT STANDARD

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). However, "[s]ummary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 572 U.S. 650, 656−57 (2014) (quoting Fed. R. Civ. P. 56(a)). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247−48 (1986). "Material facts" are those that "might affect the outcome of the suit," and a "genuine dispute" exists when "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

When ruling on a motion for summary judgment, the court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572−73 (7th Cir. 2021). However, the non-moving party "may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (2007). We are required to consider only the submissions relied upon by the parties, Fed. R. Civ. P. 56(c)(3), and we are not required to "scour every inch of the record" for evidence that is potentially relevant, *Grant v. Tr. of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017).

## II.     MOTIONS TO STRIKE AND LIMIT EXPERT TESTIMONY

After the summary judgment motion before us was fully briefed, both parties moved

to exclude and/or limit expert testimony. Specifically, Defendants moved to exclude the

following opinions of three of Plaintiff Dr. William Partin's expert witnesses: (1) Dr.

Robert McNamara's opinion testimony regarding the interpretation of the contract

between FEMA and the Hospital, (2) Bill Kottman's opinion testimony regarding the

"common practice" of hospitals in deciding to utilize the contract right of removal of

physicians, and (3) William T. Baldwin's opinion testimony related to the trends as to the

salaries and hours worked for emergency medicine physicians. *See* Docket No. 53, at 1.

Because we do not rely on the opinions of these experts in reaching our decision on

summary judgment, we do not address the parties' substantive arguments regarding the

admissibility of this evidence. However, we note that "expert testimony as to legal

conclusions that will determine the outcome of the case is inadmissible," *Good Shepard*

*Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (citing *United*

*States v. Sinclair,* 74 F.3d 753, 757 n. 1 (7th Cir. 1996)), and "[a]rgument about the

meaning of . . . contracts . . . belongs in briefs, not in 'experts' reports." *RLJCS Enters.,*

*Inc. v. Pro. Benefit Tr. Multiple Emp. Welfare Benefit Plan & Tr.*, 487 F.3d 494, 498 (7th

Cir. 2007). "Legal arguments are costly enough without being the subjects of 'experts'

depositions and extensive debates in discovery, in addition to presentations made directly

to the judge." *Id.*

Dr. Partin seeks to exclude the following testimony from Defendants' witnesses: (1)

any legal conclusions from Melanie Heniff or others regarding whether an EMTALA

violation occurred, (2) opinions of Melanie Heniff or others regarding whether Dr. Partin complied with professional standards of care, (3) opinions of John Charles Hyde regarding the legal interpretation of the FEMA contract, and (4) opinions regarding the interpretation and meaning of the Indiana Emergency Detention Order statutes. *See* Docket No. 55. We again do not address the parties' substantive arguments regarding the admissibility of this evidence for the same reasons outlined above.

However, Dr. Partin also seeks to exclude the opinions of nursing staff regarding treatment necessary for medical screening and stabilization of the patient under the Hospital's EMTALA policy. *See* Docket No. 55. Dr. Partin argues that "[n]one of this testimony is admissible as expert opinion, because the witnesses are not qualified to offer such opinions." Docket No. 56, at 3. Because physicians, not nurses, make the ultimate decisions under the Hospital's EMTALA policy, Dr. Partin contends nursing staff are "not qualified to offer any opinions regarding whether [the patient] needed certain treatment in order to satisfy Baptist's EMTALA policy." He points out that expert opinion under Federal Rule of Evidence 702 may be offered only by a "witness who is qualified as an expert by knowledge, skill, experience, training, or education," and the nurses disclosed as expert witnesses here "are not." *Id.* at 4. Contrary to Dr. Partin's contentions, we look to the Federal Rules of Evidence and federal case law in determining whether the nurses' opinions are admissible, not the Hospital's EMTALA policy.

Defendants disclosed Nurses Laura Proctor, Megan Salisbury, and Derek Brown as expert witnesses pursuant to Rule 26(a)(2)(C), which typically encompasses the expert testimony of non-retained treating physicians, whose testimony is limited "to opinions

that are within the scope of his own observation," *Martin v. Stoops Buick, Inc.*, 2016 WL

4088132, at *4 (S.D. Ind. July 28, 2016), and "to the determinations made in the course

of providing treatment." *Hambach v. Builders Transp. Co.*, 2016 WL 5847045, at *2

(S.D. Ill. Oct. 6, 2016). We do not agree with Dr. Partin that these nurses are not qualified

to testify as experts under Rule 26(a)(2)(c). The committee notes to Rule 26(a)(2)(c)

"explain that common examples of experts required to submit summary disclosures

include physicians or *other health care professionals*." *Washington v. Tovo*, 2018 WL

2126941, at *4 (N.D. Ind. May 9, 2018) (citing Fed. R. Civ. P. 26, cmt. 2010

Amendments, subdivision (a)(2)(c)). And, in *Musser v. Gentiva Health Services*, the

Seventh Circuit "agree[d] with the district court that even treating physicians and *treating*

*nurses* must be designated as experts if they are to provide expert testimony." 356 F.3d

751, 758 (7th Cir. 2004) (emphasis added). Moreover, none of these nurses were called to

testify as to anything regarding EMTALA; rather, their testimony relates only to their

treatment of the specific patient whose care was at issue, her lack of consent, and their

disagreement with Dr. Partin's handling of the situation. Thus, in ruling on the instant

summary judgment motion, we shall conclude the nurses' deposition testimony so long as

their testimony is otherwise admissible under the Federal Rules of Evidence.

### III.   FACTUAL BACKGROUND

In June of 2019, Defendant Baptist Healthcare System, Inc. d/b/a Baptist Health

Floyd (hereinafter, "the Hospital") entered into a contract with Floyd Emergency

Medicine Associates ("FEMA") that made FEMA the exclusive provider of emergency

medicine providers for the Hospital's Emergency Department. Defendant Dr. Daniel J. Eichenberger, M.D., was the Hospital's President during the time period applicable to this case. FEMA had served as the exclusive provider for at least thirty-five years pursuant to a series of sequential contracts. The Hospital and FEMA were the only parties to the 2019 contract. *See* Docket 40-1, at 1.[1] The 2019 contract gave FEMA multiple rights and imposed various obligations regarding staffing decisions for the Hospital's Emergency Department. The contract also set out multiple ways either party could terminate the contract, including a simple ninety-day written notice. *Id.* at 2. FEMA agreed to "immediately remove from providing services under [the contract] any physician" who, among other enumerated reasons, "fails to comply with any of the terms and conditions of [the contract], the written policies and procedures of [the] Hospital, or the bylaws of [the] Hospital medical staff as may be in effect from time to time, after being given notice of his failure to comply." *Id.* at 2–3.

From 2001 until his resignation at the end of 2019, Dr. Partin was one of the emergency room physicians FEMA had engaged to staff the Hospital's Emergency Department. He was an employee of FEMA as well as a director and shareholder in FEMA, and subject to a separate employment contract with FEMA that was terminable upon sixty days' notice by Dr. Partin to FEMA of his intended resignation. As a member of the Hospital's medical staff, Dr. Partin's rights and duties were governed by the Medical Staff Bylaws and Rules and Regulations, which "[u]nder no circumstances" were

---

[1] Citation pin cites refer to the parties' ECF Filing PDF pagination numbers, not the page numbers associated with the internal documents.

to "be construed to create a contractual relationship of any kind between or among the Board of Trustees or Hospital and Medical Staff, and any of its members." Docket No. 40-6, at 10. The Bylaws made all medical staff members subject to the "hospital and medical staff policies and departmental bylaws, rules and regulations, and policies," which required the medical staff to "demonstrate the ability to work cooperatively and professionally with the Hospital, its professional staff and Medical Staff, and refrain from disruptive behavior, which has or could interfere with patient care, or the smooth operation of the Hospital and its Medical Staff." *Id.* at 12, 15. "Any disruptive patterns or trends will be subject to the hospital's Code of Conduct policy," which establishes a zero-tolerance policy as to disruptive conduct. *Id.;* Docket No. 40-8, at 2. One of the examples of disruptive conduct specified in the Code of Conduct is "an unwillingness to work cooperatively and harmoniously with other members of the medical and hospital staff." Docket No. 40-8, at 3. The Code of Conduct also requires that all hospital and medical staff treat "all individuals within its facilities . . . courteously, respectfully, and with dignity," and prohibited staff from engaging in any "behavior which interferes with quality care and the safety of all concerned." *Id.* at 1, 4.

Under the Bylaws, medical staff members "have delineated clinical privileges that define the scope of patient care services they may provide." *Id.* at 11. Dr. Partin had been given clinical privileges to provide emergency care at the Hospital. The Hospital's Rules and Regulations, adopted to "implement more specifically the general principles found within the Bylaws," provided that "[p]atients who are suspected to be suicidal, emotionally ill, become emotionally ill while in the hospital, or who suffer the results of

alcoholism or substance abuse, will be medically stabilized, and then transferred, if necessary, to an appropriate facility as determined by the attending physician." Docket 43-6, at 1. The Rules and Regulations incorporate the Hospital's obligations under EMTALA: (1) every patient coming into the Emergency Department must receive a medical screening by the medical staff, and (2) if such screening determines the existence of an emergency medical condition, the Emergency Department must "stabilize the emergency medical condition of the individual within the capabilities of the staff and facilities available at the hospital, prior to discharge or transfer." *Id.* at 13−14. The Hospital's EMTALA Policy further provided that "[i]f the medical screening examination does reveal an emergency condition and the individual is admitted in good faith as an inpatient in order to stabilize the emergency medical condition, the hospital has no further obligation toward the individual under EMTALA but shall proceed to provide the individual with care and treatment governed by the Medicare Conditions of Participation." Docket 43-7, at 13−14.

Dr. Partin's tenure as a member of the medical staff at the Hospital began in 2001. By early in 2002, a long list of complaints began to be filed against him by staff and patients, including a nursing complaint that he "demand[s] rectal temperatures on [the] majority of his patients." Docket No. 40-14, at 7. On October 25, 2013, the Medical Executive Committee convened, based on a referral by Dr. Eichenberger who was then the Chief Medical Officer, to "evaluate the multitude of complaints and disruptive behaviors by Dr.

Randy Partin as well as some clinical care decisions."[2] Docket No. 40-15, at 1. During that meeting, several concerns were discussed, including: concern over "nipple twisting"; disruptive and uncooperative behavior; retaliatory behavior; inappropriate comments to patients; and inadequate documentation. *Id.* Thereafter, the Medical Executive Committee scheduled a meeting with Dr. Partin to discuss their concerns and provide him with an opportunity to respond. Following the meeting with Dr. Partin, the Committee documented its findings:

> Dr. Partin remained reluctant to admit and acknowledge the personal responsibility of the issues brought up. Dr. Partin continued to make excuses and rationalize the events stating he was always interested in patient care. He continually made reference to the hospital not addressing appropriately the multitude of complaints he and his group has made. He challenged the appropriateness of "nipple twisting" as well as some of his other clinical decisions (i.e. Labs for psych, opening the chest, comments related to pelvic exams, etc.)

Docket No. 40-13, at 2. Following the meeting, Dr. Partin was referred by the Committee to the Indiana State Medical Association Physician Assistance program based on the allegations of disruptive practitioner evaluation and assistance and was "placed on a six-month review going forward to document any further disruptive behaviors." *Id.* at 3.

In January of 2015, the Medical Executive Committee sent Dr. Partin a letter informing him that the Credentials Committee and the Medical Executive Committee had "[become] aware [of] and reviewed two other recent complaints from the Emergency Department." Docket No. 40-14, at 1. The Committee members noted "that there are numerous, documented issues regarding [Dr. Partin's] disruptive behavior [] in [his]

---

[2] Plaintiff was known as and used the nickname Randy in various settings.

credential file," so they "formally request[ed] that [Dr. Partin] make arrangements to complete [an] on-line disruptive behavior course." *Id.* Dr. Partin responded to the letter in writing, requesting further information about the complaints and seeking an opportunity to respond. *Id.* at 2−3. Dr. Partin completed the required disruptive behavior course; no further information about his conduct thereafter has been provided to the court. In fact, no record of documented complaints from 2015 through 2019, when Dr. Partin resigned from FEMA, has been submitted to the court.

Existing procedures provide that medical staff at the Hospital are to be reviewed for reappointment every two years, and in both of the reappointment review processes applicable to Dr. Partin—in June of 2016 and June of 2018—the Credentials Committee and the Medical Executive Committee recommended that he be reappointed. In both reappointment letters, performance and evaluative scorecards were included, and Dr. Partin received satisfactory marks on all factors, including in "[c]ooperation with hospital associates," "[r]elationship with peers," and "[g]eneral attitude toward practice, patients, hospital and public." Docket No. 43-16; Docket No. 43-17. However, as Dr. Eichenberger testified, "there were always issues with Dr. Partin," and, while they "weren't always written up, they weren't always put in his credential files, . . . there were always ongoing behavioral type of issues that were verbally reported through different mechanisms." Docket No. 12, at 8. The Emergency Department Director, Linda Minton, testified that problems with Dr. Partin continued after 2015 and were always "the same." Docket No. 40-17, at 2. Specifically, she testified that:

> [S]ome of the specific treatments [Dr. Partin ordered] that were concerning to the staff were things like nipple twisting when you were trying to get a response from an overdosed patient or a nonresponsive patient. I never knew him to do that on a male. But the nipple twist was what he used for females to try and get a response . . . Things like bimanual exams of women, I didn't know another physician in the emergency department to do a bimanual, which means you put a finger in the vagina and you put a finger in the rectum at the same time. Most physicians that I am aware of do a vaginal exam and then they do a rectal exam. But Randy preferred to do the bimanual. The rectal temps were, in his estimation, the more accurate way of taking a temperature. But in the opinion of the caregivers was done when it wasn't really indicated when we had someone that didn't require a rectal temp. So those were the kind of things that were of concern to the caregivers. But any challenges to those treatments would pit you against him in the fact that you're a nurse, he's a doctor and you have no right to question his medical judgment.

*Id.* at 3. Director Minton further testified that certain types of patients caused more "aggravation or potential for problems" for Dr. Partin:

> Females in particular, if you were overweight, if you were unkempt, if you were psych, if you complained or you screamed or hollered during an exam, if you questioned what he wanted to do as far as your plan of care, it was typically more female than it was male that seemed to -- to stir his ire I guess. He had far less tolerance of them than he did male patients.

*Id.* at 4. In addition to suicidal patients, Director Minton testified that certain other patient behaviors would create issues for Dr. Partin: "If you smoked; if you drank alcohol, if you were intoxicated; if you used drugs; all of those what we consider bad behavior for patients and their health, would -- yeah, you either got a lecture or you were talked to differently. Those things bothered him a great deal." *Id.*

Dr. Kevin Wurst, the Medical Director of FEMA, testified that Dr. Partin was the only FEMA partner who was: (1) subject to a Medical Executive Committee review, (2) referred to the Indiana State Medical Association Physician Assistance program for

disruptive practitioner evaluation and assistance, and (3) directed by the Medical

Executive Committee to take a disruptive physician behavior course. Docket No. 40-2, at

2−4. Dr. Wurst also testified regarding the receipt of staff complaints concerning Dr.

Partin's behavior in the emergency room throughout his tenure, and that there were still

unresolved concerns when Dr. Partin finally left his position at the Hospital. *Id.* at 4−5.

An incident involving Dr. Partin's care of a patient on September 3, 2019, led to his

departure from his position with FEMA. At 3:51 p.m. that day, a patient was brought into

the Emergency Room via ambulance after she had twice attempted to commit suicide that

day. The first suicide attempt was from a methamphetamine overdose, following which

she had been transported to another hospital, where she self-discharged against medical

advice. She was later found by police walking in the middle of a highway, attempting to

commit suicide by traffic accident. Dr. Partin was assigned as the patient's attending

physician upon her arrival in the Emergency Room, and he "put her immediately 'on

medical hold' . . . which refers to immediate detention under [Indiana Code § 12-26-4-4]

when 'a physician determines emergency treatment is necessary to preserve the health and

safety of the individual.'" Docket No. 43, at 10 (citing Docket No. 43-29). The patient

was also subjected to an Emergency Detention Order by a judge who had approved Dr.

Partin's request for such.

The patient was initially combative, attempting to leave the Emergency Room; after

being restrained by security, she refused to consent to Dr. Partin's treatment, cursed at

him, and resisted his help. Dr. Partin placed several orders to the nurses for treatment of

the patient, including the insertion of an IV line for fluids and the taking of her rectal

temperature. Staff succeeded in talking to her and securing her consent to provide a urine sample and a blood draw, but she refused the IV and rectal temperature test. The patient also agreed to cooperate by drinking water but continued to refuse the rectal temperature test, regarding it as unnecessarily invasive. One hospital staff member testified that taking rectal temperature is a procedure objected to by most patients, and Dr. Partin was the only Emergency Room doctor to regularly order it. Four Emergency Room staff members documented that eventually the previously suicidal patient became cooperative, alert, and oriented, with normal temperatures, and her heart rate and blood pressure trending down. The staff disagreed with Dr. Partin as to whether the patient has a right to refuse the ordered care. At 4:40 p.m., Nurse Megan Wolfe noted in the patient's chart that the nurses were awaiting a call back from the Emergency Room Manager, Scott White, whom the nurse had requested review the case and determine if they "are able to forcibly give [the patient an] IV and fluids since she was cooperative with giving blood and urine." Docket No. 40-19, at 38. At 5:10, Nurse Wolfe entered another note in the patient record stating that Scott White had contacted risk management and Dr. Eichenberger to review the matter and was awaiting calls back.

Around this same time, Dr. Partin contacted Dr. Eichenberger to inform him that the patient was acutely psychotic and would be in serious danger if the staff did not perform the requested medical care. According to Dr. Partin, she faced the potential of dying because the nursing staff was refusing to carry out his orders. Dr. Partin did not inform Dr. Eichenberger of the reasons for the staff's refusals. Dr. Eichenberger told Dr. Partin that the treatment decisions were his responsibility because he was the physician on duty

13

in the Emergency Department, and that if he believed strongly that she was psychotic and in need of treatment, he should proceed. At 5:30 p.m., Nurse Wolfe noted that, per Dr. Eichenberger, the patient cannot refuse the IV and the IV fluids, and the nurses must start the IV even though the patient was refusing them. At 5:40 p.m., Nurse Wolfe noted that she tried to coax the patient into consenting to the IV so that the nurses did not have to proceed against her wishes and restrain her, but the patient continued to refuse. At 5:41 p.m., Nurse Wolfe, noting the patient's continued refusal, Dr. Partin and Mr. White nonetheless had instructed the nurses to "treat" the patient. *Id.* at 39. Dr. Partin attempted to persuade the patient to cooperate, but she persisted in her refusal.

At 6:05 p.m., Nurse Laura Procter noted in the medical record Mr. White's communication to the nurses that the Hospital's legal department had confirmed that the patient can be ordered to receive this medical treatment against her will. Nurse Procter again assessed the patient, noting she continued to refuse IV access because she was drinking fluids without difficulty, and was "alert, oriented and cooperative at [the] time of assessment." *Id.* at 40. Nurse Derek Brown noted in patient's chart that the patient was able to state her full name, the time, month, date, and current president; there was "no evidence of psychosis at this time," and the patient was calm and cooperative. *Id.* At 6:10 p.m., Nurse Wolfe recorded that the patient was physically restrained by security personnel and administered ketamine per Dr. Partin's and Dr. Eichenberger's orders. The IV and rectal temperature test were then administered, causing the patient to be animatedly indignant, repeatedly comparing the procedures to rape. At 6:20 p.m., a psychological evaluator from Clark Behavioral Health arrived to assess the patient's

mental state, but when the Hospital staff informed the evaluator that the patient was
sedated, she was unable to be evaluated at the time. At 9:00 p.m., Dr. Partin noted in the
patient's medical record his "concern[] about [a] possible EMTALA violation . . . for not
providing stabilizing care for an emergency condition and [that he had] notified hospital
administration/Scott as well as Twana" from risk management.[3] Docket No. 40-19, at 35.

---

3 The arrival of the Clark Behavioral Health evaluator was the only evidence in the record
relating in any fashion to the possible transfer of the patient, and no steps were undertaken
because the patient had been sedated per Dr. Partin's order. In support of his EMTALA claim,
Dr. Partin cites that risk management employees Angie Mead and Tawana Shaffer "claimed the
patient could leave against medical advice despite being suicidal." Docket No. 43, at 12.
However, the statement of Angie Mead is inadmissible hearsay. In addition, his own note in the
patient's medical records that Tawana recommended trying to contact family or emergency
contacts to obtain patient's consent is inadmissible hearsay as well. Docket No. 40-19, at 35; *see*
*Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely upon inadmissible
hearsay to oppose a motion for summary judgment.").

Dr. Partin has submitted no admissible evidence to support his allegation that these risk
management employees had claimed the patient could leave the hospital. Dr. Partin cites his own
deposition testimony to argue that Nurse Laura Procter asked Dr. Partin to evaluate the patient
when she was initially brought in to see if she could leave; in his experience, he argues, "when a
staff member asks him this question, it means the staff wants to let the patient leave." Docket No.
43, at 9. Although self-serving deposition testimony may satisfy a party's evidentiary burden on
summary judgment, *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010), it must be sufficiently
based on reasonable inferences which are "grounded in observation or other first-hand personal
experience [and] [t]hey must not be flights of fancy, speculations, hunches, intuitions, or rumors
about matters remote from that experience," *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655,
659 (7th Cir. 1991). Dr. Partin's deposition testimony is insufficient proof of anything other than
that Nurse Procter asked him to evaluate the patient who wanted to leave.

Dr. Partin also claims that another staff member told the patient she could leave when she was
first brought to the Emergency Room. Relying solely on the Emergency Medical Services report,
about which the court has additional hearsay concerns, Dr. Partin maintains that the first staff
member of the Hospital the patient had encountered told the patient she could leave. The written
report, however, states: "the CNA" informed the patient she could not hold her there if she did
not want to be there, and the emergency responder stopped the patient from leaving because the
patient "was still in [his] care and [he] felt that she was a danger to her self and others." Docket
No. 40-19, at 145. Assuming, without deciding, that this report is admissible based on a hearsay
exception, i.e., what "the CNA" purportedly told the patient, Dr. Partin impermissibly attempts to

However, Dr. Partin testified that at the time he never reported any EMTALA violation regarding this incident to any regulatory agency or state licensing group. Docket No. 40-7, at 32–34 The patient was admitted to the hospital around midnight, and the following day, following a psychiatric evaluation when she was determined to no longer be a suicide risk, she voluntarily departed the hospital against medical advice.

The morning following the incident, (September 4, 2019), Dr. Eichenberger reviewed the patient's chart and determined that the information recorded there did not support Dr. Partin's opinion that the patient was incapable of making her own medical decisions, and further that it failed to establish that she was medically unstable or in a life-threatening situation. Dr. Eichenberger concluded that what Dr. Partin had told him on the phone had not been the entire story. Dr. Eichenberger testified that based on the information conveyed by Dr. Partin to him in the phone call, Dr. Eichenberger had understood that Dr. Partin was attempting to stabilize the patient. However, after reviewing the patient's medical records, Dr. Eichenberger discovered that the patient had already been stabilized and that the dispute between Dr. Partin and the staff related to the clinical decision of further treatment not to stabilize her because she was already stable.

---

introduce it "to prove the truth of the matter asserted." Fed. R Evid. 801(c). In response to Dr. Eichenberger's testimony explaining the unreliability of this account because the Hospital does not refer to any staff as CNAs, Dr. Partin has not identified "the CNA" mentioned by the report beyond his speculation that it was "probably an ER tech such as Chelsea Reyling." Docket No. 43, at 9 n.5. Even if this hearsay was admissible evidence, it falls short of establishing an EMTALA violation since it relates only to the turning away of a patient before screening for an emergency condition. At most, it suggests the potential for an EMTALA violation, particularly since, as Dr. Partin agrees, the patient was stabilized under his care, and ultimately admitted.

16

Also on September 4th, 2019, Emergency Department Director Grace Marksbury phoned the Vice President of Nursing to report that there had been a major incident in the Emergency Department the day before involving Dr. Partin that had upset many of the nurses. The Hospital thereupon undertook an investigation, collecting and reviewing the written statements by the involved nurses and staff. Sometime prior September 10, 2019, Dr. Eichenberger proposed that Director Marksbury, in consultation with FEMA's medical director, Dr. Wurst, determine whether it was possible at this juncture for the nurses and Dr. Partin to continue to work together or whether the culture had been damaged to a point where it was necessary to require Dr. Partin to leave his position as staff physician in the Emergency Department. Director Marksbury's opinion was that reconciliation was not possible, specifically stating that:

> Based on the information I have heard from previous situations with Dr. Partin, I do not think I can convince the ED staff to continue supporting him. I believe that risk, myself, and Dr. Eichenberger will continue to be pulled into situations due to the lack in confidence the ED staff has for his judgement [sic]. Based on my conversation with Dr. Wurst, I do not think there is a viable action plan to mend the situation with FEMA. Dr. Wurst provided no feedback on how we could get Dr. Partin and the ED staff to work collaboratively. Finally, the nurses involved in the situation on 9/3/2019 are three of my highest preforming [sic] nurses. I stand by their conviction to advocate for their patient and that Dr. Partin's documentation did not reflect the truth.

Docket No. 40-33, at 1. On September 19, 2019, Dr. Eichenberger sent a letter to Dr. Wurst requesting Dr. Partin's termination. There is no evidence indicating that the letter was disclosed or communicated to anyone outside of FEMA and the Hospital. The letter stated as follows:

The Hospital expects its staff and providers to render quality, compassionate care to its patients while demonstrating a high degree of professionalism and respectful behavior. As you know, beginning in at least 2010, the Hospital, through its administration and staff have observed and attempted to address disruptive behavior by Dr. Partin. Regretfully, this disruptive behavior persists. Despite repeated opportunities for correction, Dr. Partin continues to undermine a culture of patient safety and cooperation amongst leadership and staff within the emergency department, creating tension, hostility and an inappropriate environment. Dr. Partin continues to behave contrary to the Hospital's policies, including, by way of most recent examples, refusing to accept appropriate transfers and treatment and care for and on behalf of patients who are placed on a 72 hour hold. Consequently, this letter shall serve as [the] Hospital's formal request pursuant to Sections 1.e. and 22 of the Agreement for FEMA to ***immediately*** remove Dr. Partin from rendering emergency services at [the] Hospital.

Baptist Health Floyd desires to have a successful partnership with Floyd Emergency Medicine Associates, P.C. and its providers. More importantly, Baptist Health Floyd desires and expects its providers to deliver high quality care in a compassionate, professional and respectful manner and environment. The behaviors demonstrated by Dr. Partin are inconsistent with this goal and must be immediately remedied through the removal of Dr. Partin as a provider at the Hospital.

To the extent that Dr. Partin is not immediately removed from rendering services at the Hospital, Baptist Health Floyd will have no choice but to issue FEMA a ninety-day written notice of termination of the Agreement, pursuant to Section 1.d.

Docket No. 1-2, at 1−2. The relevant portion of Section 1.e of the FEMA Agreement provides that FEMA agrees to immediately remove any physician from providing services if the physician "fails to comply with any of the terms and conditions of this Agreement, the written policies and procedures of the Hospital, or the bylaws of [the] Hospital medical staff as may be in effect from time to time, after being given notice of his failure to comply." Docket No. 40-1, at 2−3.

On October 1, 2019, Dr. Partin resigned from FEMA and provided the required sixty-day advance notice of his intended departure. *See* Docket No. 40-34. Four months later, on January 31, 2020, the Hospital wrote to Dr. Partin to advise him that it had accepted his voluntary resignation from the medical staff membership as well as his clinical privileges. Dr. Partin did not exercise any clinical privileges at the Hospital after November 30, 2019. He was hired as a physician by another group of emergency room physicians as a physician but was not made a partner of that group since they were allegedly looking for someone younger who was just out of residency. Dr. Partin thereafter took a position with another hospital.

Dr. Partin brought the instant suit against Defendants for this alleged retaliation against him in violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA") and to assert various state law causes of action, specifically: (1) Breach of Contract as to the Bylaws, (2) Breach of Implied Covenant of Good Faith and Fair Dealing, (3) Breach of Contract as to the FEMA-Hospital Contract, (4) Tortious Interference with Contractual Relationships, (5) Tortious Interference with Business Relations, and (6) Defamation. Defendants have moved for summary judgment on all claims in his complaint, in response to which motion Dr. Partin has filed a responsive brief. We address below the issues raised in the parties' briefs.

## IV.   DISCUSSION AND DECISION

### A. EMTALA WHISTLEBLOWER

Dr. Partin specifically invokes the whistleblower protections provision of EMTALA, which protect from retaliation a physician who "refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized," and any hospital employee who "reports a violation of a requirement of this section" from being retaliated against. 42 U.S.C. § 1395dd(i). However, Dr. Partin "does not argue that he reported an EMTALA violation that had actually occurred." Docket No. 43, at 23. Instead, "[h]e argues he *refused to engage in* and therefore prevented an EMTALA violation by the hospital," and was retaliated against for his refusal. *Id.* In Dr. Partin's view, the Hospital was going to "violate EMTALA because its staff refused to complete [the patient's] medical screening and refused to stabilize the patient." *Id.* Citing Dr. Eichenberger's letter to FEMA requesting his removal from the staff, which Dr. Partin characterizes as a termination letter even though he actually had resigned, Dr. Partin claims that it was sent in retaliation for his refusal to engage in an EMTALA violation.

EMTALA was enacted to combat the incentive structure posed by modern access to medical care realities that "patients without the ability to pay sometimes rely on hospital emergency rooms not just for emergencies but to treat their routine and chronic medical problems." *Genova v. Banner Health*, 734 F.3d 1095, 1097 (10th Cir. 2013); *see also* 42 U.S.C. § 1395dd. "Meeting this demand can pose even the most altruistic hospital with a grave financial challenge," and hospitals face the "alluring temptation to shift these patients—and the losses they represent—onto nearby rivals." *Id.* "Sometimes hospitals succumb to this temptation, sometimes going so far as to 'dump' patients with genuine emergency conditions before they can be examined and stabilized." *Id.* Thus, "EMTALA

20

imposes certain mandates on hospitals regardless of whether a patient who presents to an emergency room has the ability to pay for treatment." *Gillispie v. RegionalCare Hosp. Partners Inc.*, 892 F.3d 585, 589 (3d Cir. 2018).

Under the Act, "[f]irst, a hospital must examine everyone who arrives in its emergency room seeking treatment, regardless of their ability to pay." *Genova*, 734 F.3d at 1097 (citing 42 U.S.C. § 1395dd(a)). "Second, if the examination reveals the patient is suffering from an emergency medical condition, the hospital usually must stabilize the patient before getting into the business of trying to transfer him elsewhere." *Id.* (citing 42 § U.S.C. 1395dd(a)). "Of course, the statute recognizes that sometimes a hospital simply cannot provide the treatment a patient needs: in those circumstances, the hospital must transfer the patient." *Id.* (citing 42 U.S.C. § 1395dd(b)(1)(B)). "But the basic statutory point is plain: a patient requiring emergency care may not be dumped on another hospital when there is no medical justification for doing so." *Id.* (citing 42 U.S.C. § 1395dd(c)(1)(A)).

"To help give bite to its policy objectives, EMTALA contains a pair of provisions allowing private persons the right to sue for damages." *Id.* It allows suits by '[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section." 42 U.S.C. § 1395dd(d)(2)(A). It adds with respect to whistleblowers the following:

> A participating hospital may not penalize or take adverse action [1] against a qualified medical person ... or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or [2] against any hospital employee because the employee reports a violation of a requirement of this section.

42 U.S.C. § 1395dd(i). "In the absence of direct evidence of retaliation, courts [have applied] the *McDonnell Douglas* burden-shifting framework to ... [whistleblower claims]" under EMTALA. *Elkharwily v. Mayo Holding Co.*, 823 F.3d 462, 470 (8th Cir. 2016) (collecting cases). "That familiar approach was developed for claims brought under Title VII of the Civil Rights Act of 1964." *Gillispie*, 892 F.3d at 592 (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 (1973)). Under this approach, a plaintiff must first make a prima facie showing that: (1) the plaintiff engaged in the protected activity, (2) adverse employment action, and (3) a causal connection between the two. *Id.* at 593.

We begin by noting that the provision under which Dr. Partin claims protection—a physician who "refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized"—is actually inapplicable here. There is absolutely no evidence that Hospital staff were seeking to have the patient transferred either before or after before she was stabilized and that Dr. Partin refused to do so. Instead, Dr. Partin claims that he was "*refus[ing] to engage in* and therefore prevented an EMTALA violation by the hospital." Docket No. 43, at 23. In framing his claim this way, he has pled himself out of court because such a refusal to engage in treatment protocols that might or might not lead to a prohibited transfer of the patient is not protected behavior under the terms of EMTALA. EMTALA's whistleblower protections extend to refusals to *transfer*, or reporting a violation, which Dr. Partin has conceded he did not do. *See* 42 U.S.C. § 1395dd(i). EMTALA defines the term "stabilized" in the following way: "with respect to an emergency medical condition, . . . that no material deterioration of the

condition is likely, within reasonable medical probability, to result from the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(B). "[I]n determining whether an individual was properly stabilized, a court examines 'the patient's condition at the time of the transfer or discharge." *Bergwall v. MGH Health Servs.*, 243 F. Supp. 2d 364, 374−75 (D. Md. 2002) (internal quotation marks omitted); *see also Thomas v. Christ Hosp. and Medical Ctr.*, 328 F.3d 890, 895 (7th Cir. 2003) (concluding that "at the time of discharge" was the relevant time period for whether a patient was stabilized for purposes of EMTALA).

Dr. Partin's legal theory broadens the narrow focus of the statute beyond the point of transfer to a review of the quality of care preceding a transfer. The quality and scope of treatment provided to the patient are not addressed by this statute. The Seventh Circuit held in *Nartey v. Franciscan Health Hospital* that "EMTALA is not a malpractice suit covering treatment after an emergency patient is screened and admitted. We therefore join the chorus of circuits that have concluded the EMTALA cannot be used to challenge the quality of medical care." 2 F.4.th 1020, 1025 (7th Cir. 2021) (collecting cases). In one of these cases relied upon by the Seventh Circuit, the Eleventh Circuit explained that by "prescribing minimal standards for screening and transferring patients, but not for patient care outside of these two narrowly defined contexts, Congress confined [EMTALA] solely to address its concerns and, at the same time, avoided supplanting available state malpractice and tort remedies." *Smith v. Crisp Reg'l Hosp., Inc.*, 985 F.3d 1306, 1308 (11th Cir. 2021) (quoting *Harry v. Marchant*, 291 F.3d 767, 774 (11th Cir. 2002)).

EMTALA was not intended to "be a federal malpractice statute" nor was it intended to "establish guidelines for patient care." *Id.* (quoting *Harry*, 291 F.3d at 773).

Here, the undisputed evidence shows that at the patient's time of discharge, she no longer presented with an emergency medical condition and had long before been medically stabilized. Dr. Partin thus cannot claim the protections of EMTALA to challenge his termination by referencing his care leading up to this point. There simply was no transfer of the patient ever contemplated. His remaining arguments about whether the patient had the right to refuse care are not relevant, and "[f]actual disputes that are irrelevant or unnecessary will not be counted" against an "otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247−48. Dr. Partin has not presented a prima facie case of an EMTALA violation, and as such, summary judgment must be granted in favor of Defendants on this claim.

## B.  BREACH OF BYLAWS CONTRACT

Dr. Partin has alleged two breach of contract claims against the Hospital, both based on the Bylaws. He claims that the Bylaws, "constitute a binding contract between Dr. Partin and the Hospital, [and] prescribe a review process for evaluating quality of care issues and for terminating medical staff privileges." Docket No. 63, at 9. He contends further that the Hospital "materially breached its duties under the Bylaws by terminating Dr. Partin's medical staff privileges without adhering to any of the Bylaws' prescribed processes for doing so." *Id.* According to Dr. Partin, the Hospital's breach of the Bylaws deprived him of "access to his patients and destroyed his ability to sustain his livelihood,

24

thereby causing him substantial financial harm." *Id.* Dr. Partin's claim of breach of contract of the Bylaws is a nonstarter, beginning with the fact that the Bylaws themselves expressly state that they do not create a binding contract between the Hospital and any staff member. In addition, the undisputed evidence discloses that the Hospital itself never took any adverse action related to his clinical privileges which would entitle Dr. Partin to a hearing or an appeal under the Bylaws.

"Under Indiana law, the elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." *Bible v. U.S. Aid Funds, Inc.*, 799 F.3d 633, 644 (7th Cir. 2015) (quoting *U.S. Valves, Inc. v. Dray*, 190 F.3d 811, 814 (7th Cir. 1999)). "The existence of a valid contract depends upon mutuality of obligation, i.e., there can be no contract unless both parties are bound." *Marksill Specialties, Inc. v. Barger*, 428 N.E.2d 65, 69 (Ind. Ct. App. 1981) (citing *Davis v. Davis*, 151 N.E. 134 (Ind. 1926)). In certain circumstances, Indiana courts have determined that "hospital staff bylaws can constitute a contract between the hospital and its staff.*" Pepple v. Parkview Mem'l Hosp., Inc.*, 536 N.E.2d 274, 276 (Ind. 1989) (citing *Terre Haute Reg. Hosp., Inc. v. El-Issa*, 470 N.E.2d 1371, 1377 (Ind. Ct. App. 1984). For example, in *Terre Haute Regional Hospital, Inc. v. El-Issa*, the Indiana Court of Appeals found an enforceable contract where the bylaws expressly provided that they were to be "equally binding" on the hospital and the medical staff. 470 N.E.2d at 1377. The court concluded there were mutual obligations under these bylaws, such that it must be treated as an enforceable contract. *Id.* In contrast, in *W.S.K. v. M.H.S.B.*, the Indiana Court of Appeals concluded that a hospital's bylaws did not constitute an enforceable contract because the bylaws

expressly provided that they were not to be deemed a contract of any kind between the hospital and its medical staff, and there was no such mutuality of obligation as required for an enforceable contract in Indiana. 922 N.E.2d 671, 695 (Ind. Ct. App. 2010).

Here, the Bylaws not only fail to evince an intent of behalf of the Hospital to be bound, such that the Bylaws can be enforced as a valid contract in Indiana, they specifically provide to the contrary, stating that nothing contained within the Bylaws "shall preclude the Board of Trustees from exercising its authority, when required to meet its responsibility for the conduct of the Hospital." Docket No. 40-6, at 48. The Bylaws further expressly provide that in the case of a conflict between the Bylaws of the Board of Trustees and the Bylaws applicable to the medical staff, the Board of Trustees' Bylaws will control. *Id.* As was the case in *W.S.K.*, the Bylaws at issue here plainly state that "[u]nder no circumstances shall [the] Bylaws be construed to create a contractual relationship of any kind between or among the Board of Trustees or Hospital and Medical Staff, [or] any of its members." *Id.* at 10. "If both parties to the agreement are not bound, neither is bound." *El-Issa*, 470 N.E.2d at 1377. Here, the Hospital is not bound by the medical staff Bylaws; thus, the Bylaws lack the mutuality of obligation necessary for them to constitute a valid, enforceable contract capable of giving rise to a breach of contract claim. Accordingly, Defendants are entitled to summary judgment on this claim.

## C. BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

Dr. Partin's second claim against the Hospital is again based on the Bylaws, which (he says again) "constitute a binding contract between [himself] and the Hospital, [and]

26

contain an implied covenant of good faith and fair dealing." Docket No. 61, at 10. The

Bylaws, which prescribe a review process for evaluating quality of care issues and for

terminating medical staff privileges, were violated, according to Dr. Partin, who contends

that the Hospital and Eichenberger "evaded this review process in bad faith and through

improper and unlawful attempts to use the Exclusive Provider Agreement to terminate

Dr. Partin from the medical staff." *Id.* In doing so, he says, "the Hospital and

Eichenberger deprived [him] of the benefits of a contract to which he is a party." *Id.*

    We have previously explained that the Bylaws did not create a contractual agreement

between Dr. Partin and the Hospital. In the absence a valid contract with the Hospital,

Defendants maintain that Dr. Partin cannot successfully state a claim for breach of a

covenant for good faith and fair dealing. We agree. "A party violates the implied duty of

good faith and fair dealing when, though not breaching the *express* terms of the contract,

he nonetheless behaves unreasonably or unfairly." *Jackson v. J.P. Morgan Chase Bank,*

*N.A.*, 845 F.3d 852, 856 (7th Cir. 2017) (citing *Old Nat'l Bank v. Kelly*, 31 N.E.3d 522,

531 (Ind. Ct. App. 2015)). However, "Indiana does not recognize an implied duty of good

faith and fair dealing in every contractual setting." *Id.* Rather, courts will impose such a

duty of good faith and fair dealing only "if the contract is ambiguous or expressly

imposes such a duty on the parties." *Old Nat'l Bank*, 31 N.E.3d at 531 (citing *First Fed.*

*Sav. Bank of Ind. v. Key Mkts., Inc.*, 559 N.E.2d 600, 604 (Ind. 1990)). Because the

Bylaws do not create or otherwise constitute a valid contract between the Hospital and

Dr. Partin, we need not address whether they are ambiguous or impose such a duty of

good faith. Accordingly, summary judgment in favor of Defendants will be entered on this claim.

### D.  BREACH OF FEMA CONTRACT

Dr. Partin has framed a breach of contract claim based on the Hospital's contract with FEMA as well, asserting that "FEMA had an Exclusive Provider Agreement with Hospital of which Dr. Partin was an intended beneficiary." Docket No. 61, at 11. The Hospital, Dr. Partin argues, "materially breached the Agreement by purporting to remove Dr. Partin from the emergency department service in violation of the Agreement," that is, without notice of his violations of the Hospital's policies, and that he has been "damaged as a result of the Hospital's actions." Id. Defendants point out that the contract does not include any expression of intent on the part of the Hospital to assume any direct obligations to Dr. Partin; indeed, the contract details the respective duties that it imposes on the Hospital and upon FEMA. Nowhere in the contract are obligations imposed on or assumed by the Hospital relating to individual doctors or nurses supplied by FEMA. Docket No. 40, at 43.

A party claiming to be a third-party beneficiary filing a breach of contract action must be able to show: "(1) A clear intent by the actual parties to the contract to benefit the third party; (2) a duty imposed on one of the contracting parties in favor of the third party; and (3) performance of the contract terms is necessary to render the third party a direct benefit intended by the parties to the contract." *Eckman v. Green*, 869 N.E.2d 493, 496 (Ind. Ct. App. 2007). "Among these three factors, the intent of the contracting parties to

benefit the third-party is controlling." *Alexander v. Linkmeter Dev. II, LLC*, 119 N.E.3d 603, 613 (Ind. Ct. App. 2019) (internal quotation omitted). To demonstrate intent, "[a] third party must show that it will derive more than an incidental benefit from the performance of the promisor." *Id.* (internal quotation omitted). "[I]t must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party. It is not enough that performance of the contract would be of benefit to the third party." *Cain v. Griffin*, 849 N.E.2d 507, 514 (Ind. 2006) (internal quotation omitted). Such intent to "bestow rights upon a third party must affirmatively appear from the language of the instrument when properly interpreted and construed." *Id.* (internal quotation omitted). The plain language of the contract read in context controls. "[W]henever possible," it must be construed "so as to render each word, phrase, and term meaningful, unambiguous, and harmonious with the whole." *Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012). Where there is a contract provision "expressly stating that nothing within the contract should be construed as creating any third-party beneficiaries, this is enough to defeat a third-party beneficiary claim." *Penrod v. Quality Corr. Care LLC*, 2020 WL 564163, at *3 (N.D. Ind. Feb. 5, 2020) (citing *Adv. Ground Sys. Eng'g, Inc. v. RTW Indus., Inc.*, 388 F.3d 1036, 1043 (7th Cir. 2004).

The Hospital points to the following clauses of its Agreement with FEMA:

6. RELATIONSHIP OF COMPANY AND HOSPITAL.

a. [FEMA] is and all times shall be an independent contractor supplying the services hereunder. As an independent contractor, neither [FEMA] nor any physician nor any physician extender supplied by [FEMA] are

entitled to wages or to participate in other Hospital employee benefit programs such as medical insurance and workers' compensation. Hospital shall have no responsibility with respect to withholding any taxes of any nature from the amounts to be paid by Hospital to [FEMA] hereunder, nor for the acquisition of workers' compensation insurance or any other insurance with respect to [FEMA] or any physicians or physician extenders supplied by [FEMA], nor for the payment of any items commonly referred to as "payroll taxes" including, without limitation, unemployment compensation taxes, F.I.C.A. taxes, etc. [FEMA] specifically warrants and represents that all such items are [FEMA]'s responsibility as an independent contractor rendering services hereunder.

. . .

10. FINANCIAL PROVISIONS.

a.  As an independent contractor, [FEMA] agrees to be responsible for payment of all taxes and withholdings on amounts received from Hospital. *Each physician* and physician extender *rendering services hereunder shall be considered an independent contractor of Hospital.* [FEMA] shall be exclusively responsible for any and all compensation to be paid to physicians and physician extenders rendering services hereunder, which compensation shall at all times be fair market value and commercially reasonable for the services performed. *Physicians* and Physician Extenders *shall not be entitled to any benefits that Hospital may offer to Hospital's employees from time to time.*

Docket No. 40-1, at 7, 13 (emphasis added). The Agreement's repeated use of the phrase,

"independent contractor," in addition to the provisions disclaiming any direct benefits

from the Hospital to FEMA's provided medical personnel, supports the view that the

Agreement lacks the requisite intent language necessary to create an obligation in favor

of a third-party, such as Dr. Partin.

Defendants also cite the HIPPA Business Associate Agreement that was attached to

and made a part of the Hospital's agreement with FEMA, which provides that:

> **No Third Party Beneficiaries**. Nothing in this Attachment shall confer upon any person other than the parties and their respective successors or assigns, any rights, remedies, obligations, or liability whatsoever.

Docket No. 40-1, at 38. A contract provision that "expressly stat[es] that nothing within the contract should be construed as creating any third-party beneficiaries [] is enough to defeat a third-party beneficiary claim." *Penrod*, 2020 WL 564163, at *3 (citing *RTW Indus., Inc.*, 388 F.3d at 1043). We acknowledge that this HIPPA Business Associate Agreement provision was not included in the main Agreement, only that it was "made a part of" the Agreement by virtue of the attachment. Docket No. 40-1, at 29. However, this clause clearly reinforces the absence of any intent by the Hospital or FEMA to obligate themselves for the benefit of any third-party, especially given that the attachment is the only contractual agreement provision that explicitly references the Hospital and the "contractors," i.e., FEMA's employees. *Id.*

Dr. Partin maintains that the Hospital "agreed not to remove a physician from his job except in specific enumerated circumstances – a clause that is plainly intended to protect and benefit the individual physicians." Docket No. 43, at 32. This provision provides Dr. Partin's basis for asserting third party beneficiary rights under the contract. However, a careful reading of that language makes clear that FEMA agreed to remove physicians upon the occurrence of one of the specific enumerated circumstances, which included when a physician failed to comply with the Hospital's rules "after being given notice of his failure to comply." Docket No. 43, at 32; Docket No. 40-1, at 3−4. Contrary to Dr. Partin's argument, this clause obligates FEMA to immediately remove a physician only if after being notified, the physician does not comply with the Hospital's rules; it does not

obligate the Hospital to give notice to a FEMA physician before requesting his/her termination, nor does it obligate FEMA to terminate an employee only upon the occurrence of one of the enumerated circumstances. This clause imposes an obligation on FEMA towards the Hospital to always, and immediately, remove a physician upon the occurrence of one or more of the enumerated circumstances; it imposes no reciprocal obligation on the Hospital, nor does it place an obligation on FEMA to terminate its own employees.

Dr. Partin's other arguments are similarly unavailing; for example, he contends that FEMA physicians are the intended beneficiaries of FEMA's contract with the Hospital because, in exchange for FEMA's agreement to staff the Hospital, the Hospital "agreed to subsidize the group specifically for the purpose of ensuring that the individual physicians have jobs in which they receive reasonable compensation." Docket No. 43, at 32 (citing Docket No. 40-1, at 13). The specific language on which Dr. Partin bases this claim states that the Hospital "acknowledges and agrees that in order for [FEMA] to fulfill its staffing obligations for physicians and physician extenders required pursuant to this Agreement, [FEMA's] level of revenue from the provision of professional services performed by the providers must be of a sufficient level . . . so that [FEMA] is able to provide reasonable and competitive salaries and benefits to its physicians and physician extenders." Docket No. 40-1, at 13. Further, FEMA "acknowledges and agrees that [the] Hospital must provide a revenue guarantee that is commercially reasonable and consistent with fair market value." *Id.* In other words, the Hospital agreed to provide a revenue guarantee to FEMA to ensure that FEMA "is able to adequately compensate the physicians and/or

32

physician extenders and as necessary for [FEMA] to render emergency department services at [the] Hospital," but this provision does not obligate FEMA to pay competitive salaries to its doctors or that the Hospital assumes that role directly towards the physicians. *Id.* Considering the overall relationship between FEMA and the Hospital per their Agreement to supply medical personnel to the Hospital, we cannot say that the revenue guarantee by the Hospital to FEMA obligates FEMA (or the Hospital) to guarantee compensation to its FEMA-provided doctors at specific levels. At most, the agreement between FEMA and the Hospital creates nothing more than an "incidental benefit" to Dr. Partin. *Alexander,* 119 N.E.3d at 613.

According to Dr. Partin, "FEMA physicians believe that the contract is intended to benefit not just FEMA but its individual physicians." Docket No. 43, at 32. Even if true and relevant to a resolution of the dispute before us, this claim fails because, insofar as Dr. Partin's alleged entitlement is concerned, "[i]t is not enough that performance of the contract would [simply] be of benefit to the third party." *Cain*, 849 N.E.2d at 514 (internal quotation omitted). The controlling issue is whether the contract's purpose was to "impose an *obligation* on one of the contracting parties in favor of the third party." *Id.* (emphasis added). Dr. Partin has failed to identify any such purpose or obligation in his favor. Accordingly, Defendants are entitled to summary judgment on this claim as well.

### E.  TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS

Dr. Partin next contends that Defendants tortiously interfered with his Employment Agreement with FEMA, which was a valid and enforceable contract. Docket No. 61, at

11. He argues that Dr. Eichenberger and the Hospital induced the termination of his contract with FEMA through "undue economic coercion and threats of financial ruin against FEMA," "defamatory statements about Dr. Partin in the Termination Letter," and "retaliatory acts in violation of EMTALA and Indiana law." *Id.* All of these actions, he asserts, were: "without legal or factual grounds under the Exclusive Provider Agreement," made "in bad faith to avoid the process in the medical staff bylaw," and "based on ill will and malice against Dr. Partin." *Id.* In response, Defendants argue that they had a "legitimate reason and contractual right to request that [Dr. Partin] no longer provide emergency medicine services at [the Hospital]," Docket No. 40 at 45, and the actions it took were pursuant to those reasons and rights.

Under Indiana law, the elements of an action for interference with a contract are: (1) the existence of a valid and enforceable contract; (2) defendants' knowledge of the contract's existence; (3) defendants' intentional inducement of the breach of the contract; (4) the absence of justification; and (5) damages resulting therefrom. *Furno v. Citizens Ins. Co. of Am.*, 590 N.E.2d 1137, 1140 (Ind. Ct. App. 1992). The critical element at issue here is whether Defendants' actions were justifiable, in which case any "interference" would not be tortious. *Flintridge Station Assoc. v. Am. Fletcher Mortg. Co.*, 761 F.2d 434, 441 (7th Cir. 1985). "A plaintiff must state more than a mere assertion that the defendant's conduct was unjustified." *Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E.2d 1268, 1272 (Ind. Ct. App. 2000). Instead, "'absence of justification' requires proof that the 'interferer acted intentionally, without a legitimate business purpose, and the breach is malicious and exclusively directed to the injury and damage of another.'" *Am.*

34

*Commercial Lines LLC v. Lubrizol*, 2015 WL 5295128, at *4 (S.D. Ind. Sept. 10, 2015) (quoting *Miller v. Central Ind. Commty. Found., Inc.*, 11 N.E.3d 944, 961 (Ind. Ct. App. 2014)); *see also Flintridge*, 761 F.2d at 441 (defining unjustified as "disinterested malevolence"; "a malicious [conduct] unmixed with any other and exclusively directed to injury and damage of another"). The "existence of a legitimate reason for the defendant's actions provides the necessary justification to avoid liability." *CoBank*, 736 N.E.2d at 1272 (citing *Wrinkler*, 619 N.E.2d at 600−01).

Dr. Partin does not contest that Defendants had a legitimate reason for requesting that FEMA terminate him. The closest Dr. Partin comes to addressing this argument that the Hospital had a legitimate reason to seek termination of his employment is his colorful argument that, "[c]ontrary to Defendants' portrayal of the law, [his claim] does not fail if the Court finds one particle of proper motivation floating in a sea of Defendants' bad conduct." Docket No. 43, at 33. He suggests that the "facts of this case fall neatly" into a "classic form of improper tortious conduct through the exertion of undue 'economic pressure,'" arguing that "courts have found specifically that a threat by A to terminate its contract with B unless B takes action against C may constitute tortious interference." *Id.* For support, Dr. Partin cites a Connecticut case. *Id.* (citing *FB Const. Mgmt. of Trumbull, Inc. v. Herbst*, 2013 WL 6989510, at *4 (Conn. Super. Ct. Dec. 18, 2013)). Moreover, he says that "threatening to terminate a contract with an employer unless it fires a specific employee is a clear example" of such undue economic pressure, support for which, this time, he cites an Arizona case. *Id.* (citing *Riley v. City of Prescott, Ariz.*, 2014 WL 641632, at *14 (D. Ariz. Feb. 19, 2014)).

We rely on Indiana law, and Indiana law directs Dr. Partin to show, if he can, that Defendants "acted with malicious intent 'unmixed with any other [intent] and exclusively directed to the injury and damage of another.'" *Lubrizol*, 2015 WL 5295128, at \*6 (quoting *Flintridge*, 761 F.2d at 441). Dr. Partin's claims and arguments fall well short of satisfying this requisite showing. Here, the evidence reveals multiple, legitimate reasons in support of Defendants' conclusion that to have Dr. Partin was no longer welcome as a physician caring for patients within their facility: "failing to treat a patient with dignity, failing to honor a patient's expressed refusal of care, failing to work collaboratively and collegially with nursing staff and misrepresenting and omitting material facts to the [Hospital's] President," each of which incidents violated the Hospital's rules and policies. Docket No. 40, at 48. Even if Dr. Partin was "fired" due to the Hospital's and Dr. Eichenberger's actions (the uncontested facts show that Dr. Partin actually resigned), no reasonable jury could find that the Defendants' exclusive justification for its actions was either malicious or unconnected to any legitimate business purpose or that it was based solely on the goal of inducing FEMA to breach its contract with Dr. Partin. Accordingly, Defendants are once again entitled to summary judgment, this time on Dr. Partin's tortious interference with contract claim.

### F.  TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

Dr. Partin also claims that the Hospital and Dr. Eichenberger intentionally interfered with the business relationships between himself and his patients "by acting to remove Dr. Partin from performing emergency medical services at the Hospital, thereby cutting off

Dr. Partin's ability to treat patients." Docket No. 61, at 12. The interference was unjustified, he maintains, because "it was accomplished through undue economic coercion and threats of financial ruin against FEMA; through defamatory statements about Dr. Partin in the Termination Letter; through retaliatory acts in violation of EMTALA and Indiana law; without legal or factual grounds under the Exclusive Provider Agreement; in bad faith to avoid the process in the medical staff bylaw; and based on ill will and malice against Dr. Partin." *Id.* Dr. Partin claims these actions by Defendants caused him to incur damage for which Defendants should compensate him. Defendants rejoin that Dr. Partin is unable to prove the essential element requiring some independent illegal conduct. Because his EMTALA allegation is the only claim that arguably could satisfy the illegal conduct element, and because his EMTALA claim has not survived our judicial review, his interference with business relationships claim fails as well. Docket No. 40, at 51−52.

To prevail on a claim for tortious interference with business relationships, Dr. Partin must prove: (1) the existence of a valid relationship, (2) Defendants' knowledge of the existence of the relationship, (3) Defendants' intentional interference with that relationship, (4) the absence of justification, and (5) damages resulting from the Defendants' wrongful interference with the relationship. *Gov't Payment Serv. v. Ace Bail Bonds*, 854 N.E.2d 1205, 1209 (Ind. Ct. App. 2006) (citing *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 598 n. 21 (Ind. 2001)). As Defendants have noted, a claim of tortious interference with a business relationship "requires some independent illegal action." *Id.* (citing *Brazauskas v. Fort Wayne-South Bend Diocese, Inc.*, 796 N.E.2d 286, 291 (Ind.

37

Ct. App. 1999)). "Indiana law appears settled that neither defamation nor breach of contract satisfies the 'illegal action' requirement." *Nikkish Software Corp. v. Manatron, Inc.*, 801 F. Supp. 2d 791, 797 (S.D. Ind. 2011). We also agree with Defendants that Dr. Partin's allegation of illegal EMTALA retaliation is the only allegation that could possibly support a tortious interference with business relationships claim, but since we have dismissed his EMTALA claim, this interference with business relationships claim likewise collapses. Accordingly, summary judgment in favor of the Defendants on this claim is required.

### G. DEFAMATION CLAIMS

Dr. Partin includes in his prolix complaint two claims of defamation: first, Dr. Eichenberger's letter to FEMA, requesting Dr. Partin's removal from the Hospital's Emergency Department; and second, an email from Director Marksbury sent to her supervisor, Kelly McMinoway, who was a Hospital administrator as well, which Ms. McMinoway forwarded to Dr. Eichenberger.[4] Dr. Partin has alleged that the Eichenberger letter was published to FEMA and "others within the Hospital," and that Marksbury's email was published to Hospital administrators, including Dr. Eichenberger. Docket No. 61, at 13. Defendants attack these allegedly defamatory actions based on the lack of any publication: regarding the letter, Defendants maintain that their contractual

---

[4] The Court granted Dr. Partin leave to amend his complaint after Defendants moved for summary judgment to allow him to add this second defamation claim against Defendants because he had not learned of the Marksbury email until discovery was well underway. The Court allowed Defendants an additional fourteen days to supplement its reply brief in support of their motion for summary judgment to include additional arguments regarding the email. Thus, we consider here on summary judgment both instances of alleged defamation.

rights and duties not only justified, but required the communications of their concerns to FEMA. (Dr. Partin has produced no evidence showing that the letter was distributed to anyone else within the Hospital). As for Marksbury's email, Defendants argue it was protected by Indiana's qualified privilege for intracorporate communications because it was made in good faith pursuant to the duty privately imposed on her by her supervisors and was made to a person with a corresponding duty or interest in the information conveyed. In response, Dr. Partin maintains that neither act of defamation was protected by Indiana's qualified privilege because Defendants lost the benefit of any such privilege when they made statements "without belief or grounds for belief in its truth." Docket No. 43, at 35 (quoting *Bals v. Verduzco*, 600 N.E.2d 1353, 1356 (Ind. 1992).

To maintain an action for defamation under Indiana law, Dr. Partin must be able to demonstrate: "(1) a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages." *Kelley v. Tanoos*, 865 N.E.2d 593, 597 (Ind. 2007) (citing *Schrader v. Eli Lilly* and Co., 639 N.E.2d 258, 261 (Ind. 1994). "Defamation is not actionable unless there is a 'publication.'" *Delal v. PPG Indus., Inc.*, 590 N.E.2d 1078, 1080-81 (Ind. Ct. App. 1992) (citing *Brockman v. Detroit Diesel Allison Div. Etc.*, 366 N.E.2d 1201 (Ind. 1977)). "Without communication of defamatory matter to a third party, it is of no consequence whether the communication is actionable per se, privileged, or uttered with malice." *Id.*

Indiana law affords a qualified privilege defense to a defamation claim for "communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or

private, either legal, moral, or social, if made to a person having a corresponding interest or duty." *Kelley*, 865 N.E.2d at 597 (citing *Bals v. Verduzco,* 600 N.E.2d 1353, 1356 (Ind. 1992)). The privilege is intended to foster "full and unrestricted communication on matters in which the parties have a common interest or duty." *Schrader*, 639 N.E.2d at 262. "In the absence of a factual dispute, the applicability of the privilege is a question of law to be determined by the court." *Kelley*, 865 N.E.2d at 597.

Even when the privilege applies, "[t]here is a limit to the scope of protection available under the qualified privilege doctrine." *Id.* at 598. "A communication otherwise protected by a qualified privilege may lose its protection if it is shown that: '(1) the communicator was primarily motivated by ill will in making the statement; (2) there was excessive publication of the defamatory statements; or (3) the statement was made without belief or grounds for belief in its truth.'" *Id.* (quoting *Bals*, 600 N.E.2d at 1356). "And although the term 'malice' is frequently applied in viewing such acts, it appears 'the essence of the concept is not the speaker's spite but his abuse of the privileged occasion by going beyond the scope of the purposes for which privilege exists.'" *Id.* "Once the communication is established as qualifiedly privileged, the plaintiff then has the burden of overcoming that privilege by showing that it has been abused." *Schrader*, 639 N.E.2d at 262. "The essential elements of the defense of qualified privilege are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner to the appropriate parties only." *Id.*

### 1.   DR. EICHENBERGER'S LETTER TO FEMA

We begin by holding that Dr. Eichenberger's letter to FEMA does not constitute actionable defamation because it was not published to any third-party; the evidence shows that it was sent only to FEMA, a recipient with whom Defendants had a contractual obligation to communicate regarding the conduct of any of FEMA's physicians. Indeed, the Agreement specifically provided that the Hospital "shall inform" FEMA of "any conduct or activities of any [FEMA]-supplied physician or physician extender which impairs [FEMA]'s ability to perform services at Hospital or which may adversely reflect upon the physician's or physician extender's professional competence." Docket No. 40-1, at 5. FEMA has a reciprocal obligation under the contract with the Hospital to "confer" with the Hospital "on an as needed basis" regarding any physician conduct issues. *Id.* at 11. Dr. Partin does not dispute that Defendants had such a contractual obligation to communicate this material, nor does he argue on summary judgment that the letter was distributed to anyone else. Instead, Dr. Partin challenges Defendants' alternative argument that the letter is covered by Indiana's qualified privilege; specifically, he argues that Dr. Eichenberger had no factual basis for the false statements set out in his letter.

Even if Dr. Eichenberger's letter were construed as a communication to a third-party, the qualified privilege protects the letter against a defamation claim, given that both FEMA and the Hospital had a common interest and duty to secure and enhance the safety of the staff and patients within the Emergency Department by engaging physicians who met all the required performance standards.

41

## 2.   DIRECTOR MARKSBURY'S EMAIL

Dr. Partin also contends that Defendants forfeited their qualified privilege for Director Marksbury's intracompany email communications when she wrote these messages "without belief or grounds for belief in [their] truth." *Bals*, 600 N.E.2d at 1356. Defendants rejoin that Director Marksbury did not abuse the privilege in any respect since she was reporting information and opinions to her supervisors as she was duty-bound to do, informing them: that she did not think she could convince the Emergency Department staff to continue supporting Dr. Partin, that administrators would continue to be pulled into situations due to the lack in confidence in Dr. Partin's judgment, and that, based on her conversation with Dr. Wurst, she did not think there was a viable action plan to repair the situation within FEMA because Dr. Wurst provided no feedback on ways to get Dr. Partin and the Emergency Department staff to work collaboratively. Docket No. 40-33, at 1. Moreover, Director Marksbury wrote in her email that the nurses involved in this situation were some of her highest-performing nurses, and that she stood by their conviction to advocate for their patient, and their judgment that Dr. Partin's documentation did not reflect the truth. *Id.*

"Intracompany communications regarding the fitness of an employee are protected by the qualified privilege, in order to accommodate the important role of free and open intracompany communications and legitimate human resource management needs." *Schrader*, 639 N.E.2d at 262. "The privilege protects personnel evaluation information communicated in good faith." *Id.* "The essential elements of the defense of qualified privilege are good faith, an interest to be upheld, a statement limited in its scope to this

purpose, a proper occasion, and publication in a proper manner to the appropriate parties only." *Id*.

Here, the evidence indisputably establishes that the purpose of Director Marksbury's email was to report the kind of information to her supervisor, that she was required to convey. She communicated her opinions, based on information she had obtained from conferring with staff, and her concerns were legitimate concerns, arising from her own investigation of the incident. Moreover, her email was limited to its (important) business purpose and was published only to her supervisors. There is no evidence that the email was ever improperly communicated to any outside parties. Accordingly, the uncontroverted evidence establishes that Dr. Marksbury is entitled to the protections of a qualified privilege.

"Once the communication is established as qualifiedly privileged, the plaintiff then has the burden of overcoming that privilege by showing that it has been abused." *Id*. Dr. Partin has not met his burden of overcoming the privilege; he points merely to Director Marksbury's deposition testimony wherein she states that she did not personally determine that Dr. Partin's documentation did not reflect the truth, since she was not present at the time, but that, even so, she stood by her nurses' conviction that Dr. Partin's documentation did not reflect the truth. Docket No. 69-1, at 5. No reasonable jury could find that Defendants' communications leading up to Dr. Partin's resignation were improper, much less defamatory; accordingly, summary judgment favors Defendants on both defamation claims.

## V.    CONCLUSION

Accordingly, as explained above, Defendants' Motion for Summary Judgment

[Docket No. 38] is **GRANTED** as to all claims. All other pending motions are denied as

moot. Final judgment shall be issued accordingly.

IT IS SO ORDERED.

Date:    10/17/2022              _Sarah Evans Barker_

                                SARAH EVANS BARKER, JUDGE
                                United States District Court
                                Southern District of Indiana

Distribution:

John Robert Hofmann
WATERS TYLER HOFMANN & SCOTT, LLC
jhofmann@wthslaw.com

Michael C. Merrick
KAPLAN JOHNSON ABATE & BIRD LLP
mmerrick@kaplanjohnsonlaw.com

Rodney Lee Scott
WATERS, TYLER, HOFMANN & SCOTT, LLC
rscott@wthslaw.com